747 So.2d 293 (1999)
STATE FARM FIRE & CASUALTY COMPANY
v.
Gaines B. SLADE and Ina Slade.
Gaines B. Slade and Ina Slade
v.
State Farm Fire & Casualty Company.
1961769 and 1961770.
Supreme Court of Alabama.
August 27, 1999.
Rehearing Applications Denied October 29, 1999.
*297 Micheal S. Jackson, Michael B. Beers, and Winston W. Edwards of Beers, Anderson, Jackson, Nelson, Hughes & Patty, P.C., Montgomery, for appellant/cross appellee State Farm Fire and Casualty Company.
Roger S. Morrow, Wesley Romine, and Chandra C. Wright of Morrow, Romine & Pearson, P.C., Montgomery, for appellee/cross appellants Gaines B. Slade and Ina Slade.

On Application for Rehearing
LYONS, Justice.
The opinion of February 12, 1999, is withdrawn and the following is substituted therefor.
This case involves allegations of misrepresentation, suppression, deceit, breach of contract, and bad faith, all arising from the sale of a homeowner's insurance policy and the adjustment of a claim on that policy. Gaines B. Slade and Ina Slade sued State Farm Fire & Casualty Company after State Farm had denied their insurance claim based on damage to their home.

Facts and Procedural History
In March 1992, the Slades undertook construction of their home in Montgomery. The Slades paid approximately $650,000 for the construction. During the construction of their home, the Slades' next-door neighbors commenced construction of a home and removed a substantial amount of soil from their lot. The soil removal created a severe drop-off between the neighbors' property and the Slades' property. This drop-off required the Slades to construct a retaining wall on the property line, along the drop-off, to prevent erosion and soil movement. This retaining wall was attached to the Slades' home.
On January 16, 1993, the Slades purchased a State Farm "Homeowner's Extra" policy. This policy was in effect at the time of the occurrence of the events later made the basis of the Slades' insurance claim. On August 4, 1993, the retaining wall collapsed when lightning struck it during a severe storm. The collapse of the wall caused the ground around the Slades' *298 backyard pool to give way; this resulted in extensive damage to the pool area. State Farm paid for the repairs to the Slades' pool and for the replacement of the wall and of the soil that was washed away during the storm. Soil was replaced up to three feet from the corner of the Slades' home, but no soil was replaced under the slab area of the home.
In October 1993, the Slades noticed cracking in the ceilings and in the interior and exterior walls of their home. They informed State Farm of this cracking on November 8, 1993. On November 15, 1993, David Majors, a State Farm claims adjuster, went to the Slades' home and examined the cracks in the walls and ceilings and in the exterior of the home. Mr. Slade told Majors that he had contacted Walter Riley, the contractor who had rebuilt the Slades' pool and retaining wall, and had asked him to monitor the cracks and possible ground movement around his home to determine if any ground movement was causing the cracking. Riley contacted three firms to have them determine the cause of the cracking and give estimates for repair. When Mr. Slade talked with Majors, Mr. Slade attributed the cracking to the fact that lightning had struck the retaining wall and caused it to collapse. The Slades believed that the damage was covered by the terms of their policy, which covered damage directly caused by lightning.[1]
The three firms began their work in November 1993. Because the firms did not complete their reports by Christmas, the Slades asked State Farm and the firms to suspend work until after the Christmas holidays. By January 19, 1994, State Farm had received all three reports stating the cause of the damage, the repairs needed, and the estimated cost of the repairs. All three of these reports stated that the cause of the cracking at the Slades' home was that the soil beneath the home had moved by settling or shifting and that this movement had caused the foundation to move, thereby causing the cracks. The reports also said that the soil had moved as a result of the collapse of the retaining wall after lightning struck it.
Sometime after January 1, 1994, State Farm became concerned that the cracking in the Slades' home might not be covered under their policy because the policy contained an exclusion for losses caused by "earth movement." Although the policy covered damage to the Slades' property proximately caused by lightning, Di Williams, Majors's claims supervisor, believed that the Slades' claim presented a "concurrent-causation question," meaning that there was a question whether the two events, the lightning and the earth movement, had combined to cause the Slades' loss. According to State Farm, any loss caused by earth movement was not covered, because the Slades' policy excluded coverage of damage caused by earth movement. This earth-movement exclusion states:
"2. We do not insure under any coverage for any loss which would not have occurred in the absence of one or more of the following excluded events. We do not insure for such loss regardless of: (a) the cause of the excluded event; or (b) other causes of the loss; or (c) *299 whether other causes acted concurrently or in any sequence with the excluded event to produce the loss; or (d) whether the event occurs suddenly or gradually, involves isolated or widespread damage, arises from natural or external forces, or occurs as the result of any combination of these:
". . . .
"b. Earth Movement, meaning the sinking, rising, shifting, expanding or contracting of earth, all whether combined with water or not. Earth movement includes, but is not limited to earthquake, landslide, mudflow, sinkhole, subsidence and erosion. Earth movement also includes volcanic explosion or lava flow, except as specifically provided in SECTION IADDITIONAL COVERAGES, Volcanic Action."
(Emphasis in original.)
On January 13, 1994, Williams and Majors conferred with State Farm's claims superintendent in Montgomery, Pat Craig, about the earth-movement exclusion. Williams telephoned State Farm's in-house legal counsel, James Swift, to brief him on the facts of the Slades' claim and to discuss the concurrent-causation question. Mr. Swift asked her what the engineer's report stated regarding the cause of the Slades' loss. Williams told Mr. Swift that State Farm did not have an engineer's report. Williams then wrote a note to Majors on State Farm's claims log, telling him to contact the Slades for the purpose of getting an engineer's report and to tell the Slades that State Farm would review the engineer's report and "get back with them on coverage." The note also told Majors not to commit to coverage. Majors never told the Slades about the possible coverage questions.
After the conversation with Swift on January 13, 1994, Williams, Majors, and Craig believed that the Slades' loss was covered under the policy only if the lightning had directly hit either the Slades' home or the soil underneath their home. Also at this time, Craig and Williams assumed the main responsibilities in the adjustment of the Slades' claim.
On January 19, 1994, Craig received the last of the three initial reports regarding the cause of the damage at the Slades' home, and the cost of repair. On that day, Craig wrote in the log of the Slades' claim: "Received report from Quality Assurance Testing Laboratories, states earth movement, does not state cause due to lightning, need to write letter to insured to bring up to date on where we are." He also received a telephone call from Riley, the contractor, about hiring an engineer. Craig made a note of this call in the claims log, and, according to the Slades, wrote "not insured." However, at trial, Craig testified that he could not read his own handwriting and was unsure of his notation.
Craig testified that the three initial reports gave him "serious concerns" as to whether the Slades' claim was covered under their policy. He told Riley that he would find a structural engineer who would determine if the lightning was the direct cause of the damage. On January 24, he sent a letter to in-house counsel James Swift indicating that the reports addressed earth movement and not direct lightning contact with the soil. Craig again stated that he wanted to contact a structural engineer in order to learn whether the cracking at the Slades home was direct damage from lightning. Craig testified that he was concerned that the three initial reports were not thorough. However, Craig never talked to anyone who prepared the initial reports.
On January 28, 1994, Craig telephoned J.A. "Buck" Durham, a structural engineer. Craig said he had never used Durham before and that he got his name from Harry Dillinger, a State Farm claims superintendent in Huntsville. Craig did not inquire about Durham's expertise. Instead, he relied on Dillinger's recommendation that Durham was qualified to address the problems at the Slades' home. *300 Craig set a date, February 2, 1994, for Durham to travel to Montgomery to conduct an "independent investigation" of the Slades' claim. Craig later obtained the Slades' permission for Durham to inspect their home. The Slades thought Durham would conduct the inspection to determine how to repair their home. However, at this time Craig did not inform the Sladesnor had he informed them before that their claim might not be covered under their policy.
Either during or after Craig's first conversation with Durham, Durham filled out an "Insurance Engineering Inspection Form." In that form, Durham wrote that the Slades' home was worth $500,000 and that the type of claim was "severe cracking interior/exteriorpossible soil problem." However, Craig denied giving Durham that information and testified that he told Durham that there was "some interior cracking" in the Slades' home.[2] Also, although State Farm has consistently maintained that its usual policy is to attempt to find coverage for the insured, Craig did not tell Durham about the lightning or tell him that State Farm's policy was to attempt to find coverage for the insured.
On February 2, 1994, both Craig, who had not been to the Slades' home, and Durham visited the property. At this visit, Craig did not inform the Slades of State Farm's coverage questions. Craig looked at the damage and then went back to his office. There, he wrote Mr. Slade a letter that, he says, was a "reservation-of-rights" letter, although it did not conform with State Farm's policies for such a letter. However, the letter did give notice that State Farm had questions about covering the damage to their home. This letter read:
"Dear Mr. Slade:
"I am writing you this letter to follow up our meeting of Wednesday, February 2, 1994, at your home. The meeting at your home was the result of receiving several reports from Mr. Walter Riley of B.A. Parsons Contracting concerning damage that has occurred at your home. We received the last report on January 19, 1994, from Quality Assurance Testing Laboratories, Inc.
"All of the reports have indicated that the problem at your home appears to be earth movement related to settlement in the suspected area under your home.
"Mr. J.A. Durham, an engineer I contacted, was at your home on February 2 for the purpose of furnishing us with a detailed report concerning the problems at your home.
"The purpose in contacting and having Mr. Durham inspect your home was to determine what is causing the earth movement at your home.
"Hopefully, Mr. Durham's final report will provide us with the cause of the earth movement.
"I have to advise you that under your Homeowner's policy, there are losses that would not be insured. Losses due to settling, cracking, shrinking, bulging, or expansion of pavements, patios, foundations, walls, floors, roofs or ceilings would not be covered under your policy.
"Earth movement, meaning the sinking, rising, shifting, expanding, or contracting of earth, all whether combined with water or not, would not be covered under your Homeowner's policy.
"I will have to wait to receive Mr. Durham's final report as to his findings to be able to make any determination whether the damage to your home will be covered by your Homeowner's policy.
"As I indicated in our meeting of February 2, I advised you that as soon as I receive Durham's report, I will be back in contact with you to discuss his findings.
 "Sincerely,
*301
 "Pat J. Craig"
On February 2, when Craig left, Durham remained at the Slades' home to complete his inspection. Durham's inspection consisted of a visual examination, talking with Mr. Slade, and examining the soil-compaction-test reports,[3] the construction plans for the Slades' home, and the city inspector's report of his inspection of the foundation of the Slades' home. Durham also said that before making his inspection of the Slades' home, he had visited the Montgomery County office of the Soil Conservation Service, where, he said, he learned that the soils around the Slades' home are "expansive clays," i.e., soils that often undergo shrinking or swelling and are thereby made unstable. It is undisputed that Durham was not qualified to conductand did not conductan investigation regarding possible lightning damage.
On February 20, Craig received Durham's report from the February 2 inspection. Durham concluded that the cracking at the Slades' home was the result of "post-construction differential foundation settlement." Durham believed that improper soil compaction and faulty construction had caused the settlement. In his report, Durham stated: "I do not feel that this settlement is related, in any way, to the severe, storm or lightning that occurred in August, 1993." His report also did not address the finding of the three initial reports that the soil movement was the result of a collapse of the retaining wall caused by a lightning strike to the retaining wall.
On the basis of Durham's report, Craig recommended that the Slades' claim be denied. On March 10, 1994, a five-person claims committee voted to deny the Slades' claim. The information before the committee included Durham's report, the three initial reports, and the recommendations of State Farm's employees involved in the adjustment of the Slades' claim. No one communicated to the Slades the action of the claims committee.
Evidence presented at trial indicated that after the action of the claims committee, State Farm thought the Slades would sue. Other evidence indicated that State Farm refused to give the Slades a copy of Durham's report and that State Farm continued to investigate the Slades' claim by hiring more engineers. A letter from Durham to one of these engineers told the engineer to investigate the Slades' property "with the purpose being to defend the insurance company against any claim of lightning-related, settlement, or structural damage." (Emphasis added.) State Farm also continued to send the Slades letters stating that State Farm was still considering coverage. Later, on July 25, 1994, a second claims committee was convened; it also voted to deny the Slades' claim. The evidence also indicates that the Slades frequently inquired about the status of their claim and were told that State Farm was still considering coverage.
During this time, State Farm hired other engineers to inspect the Slades' home. Every report tendered to State Farm indicated that the soil under the Slades' home had shifted or settled. Some reports stated that the cause of the shifting was poor construction of the Slades' home. Other reports indicated that natural swelling and shrinking of the clay under the Slades' home caused the soil movement, and even other reports stated that the lightning strike to the Slades' retaining wall and its subsequent collapse may have started the chain of events that resulted in the soil movement. It is undisputed that none of these engineers was qualified to conduct an investigation regarding possible lightning damage. Based upon all these reports, on August 29, 1994, Craig sent the *302 Slades a formal denial letter, citing the allegedly relevant exclusions in their policy.
On February 27, 1995, the Slades sued State Farm and a number of contractors involved in the construction of their home. The Slades entered into a pro tanto settlement with all defendants other than State Farm, in the amount of $301,500. The initial complaint against State Farm alleged fraud and suppression in the sale of the policy, breach of contract, and bad-faith adjustment of their insurance claim. The Slades amended their complaint to allege fraud, suppression, and deceit by State Farm during the adjustment of their claim. The parties tried the case before a jury.
During the trial, the court granted State Farm's motion for a judgment as a matter of law ("JML")[4] as to the Slades' claims of fraud in the sale of the policy and granted a motion for a partial JML on the Slades' breach-of-contract claim on the issue of collapse coverage, but the court denied State Farm's motion for a JML on the other claims. The jury found in favor of the Slades on the claims of fraud and bad faith in the adjustment of the Slades' insurance claim, but against the Slades on the breach-of-contract claim. The jury awarded the Slades $668,850 in compensatory damages, but reduced that award by $301,500, the amount of the pro tanto settlement. The jury also awarded the Slades $301,500 in punitive damages. The trial court entered a judgment in favor of the Slades in the amount of $668,850.
State Farm filed a timely motion for JML and a motion to alter or amend the judgment, or, in the alternative, a motion for new trial. The Slades also filed a timely motion for JML or for a new trial on the issues of breach of contract for collapse coverage and fraud in the sale of the insurance policy. The Slades also sought to reinstate the amount of the verdict reduced by the amount of the pro tanto settlement. The trial court denied all posttrial motions. The court also awarded costs, in the amount of $21,753.83, to the Slades, including the costs incurred to secure the testimony of the Slades' experts. State Farm appealed, and the Slades cross-appealed.
State Farm presents several issues. The Slades do not want us to address their cross-appeal if we affirm the judgment against State Farm. For the reasons discussed below, we reverse those portions of the judgment State Farm appeals from, remand this case for a new trial on certain of the Slades' claims alleging breach of contract and bad faith, and render a judgment for State Farm on the Slades' claims alleging fraud in the adjustment of an insurance claim. We affirm in part and reverse in part the portions of the trial court's judgment that are the basis of the Slades' cross appeal.

I. State Farm's Appeal
State Farm argues that the trial court erred in denying its preverdict and postverdict motions for JML on the Slades' breach-of-contract, fraud, and bad-faith claims.

A. Standard of Review
When reviewing a ruling on a motion for JML, this Court uses the same standard the trial court used initially in granting or denying a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala. 1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case or issue to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). *303 The nonmovant must present substantial evidence to withstand a motion for JML. See § 12-21-12, Ala.Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Id. Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court's ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala.1992).

B. Breach-of-Contract/Bad-Faith Claims

1. The Law
A plaintiff can establish a breach-of-contract claim by showing "(1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages." Southern Medical Health Systems, Inc. v. Vaughn, 669 So.2d 98, 99 (Ala.1995) (citations omitted).
Unlike the elements of a breach-of-contract claim, however, the standards for recovery for a bad-faith refusal to pay a first-party insurance claim are not so clear. This lack of precision has caused confusion among the bench and bar and has caused much of the debate in this case. Therefore, we take this opportunity to review and clarify the standards for recovery under a theory of bad-faith refusal to pay a first-party insurance claim.
In Thomas v. Principal Financial Group, 566 So.2d 735 (Ala.1990), Justice Houston (with three Justices concurring and three concurring in the result) provided this Court with a road map to guide us through the vagaries of the tort of bad faith. First, Justice Houston noted that this Court had recognized the tort of bad-faith failure to pay a first-party claim in Chavers v. National Security Fire & Casualty Co., 405 So.2d 1 (Ala.1981). Thomas, 566 So.2d at 740. In Chavers, this Court held:
"[A]n actionable tort arises for an insurer's intentional refusal to settle a direct claim where there is either `(1) no lawful basis for the refusal coupled with actual knowledge of that fact or (2) intentional failure to determine whether or not there was any lawful basis for such refusal.'"
405 So.2d at 7.
Justice Houston then recognized that "[t]he Chavers test was refined and clarified in Gulf Atlantic Life Ins. Co. v. Barnes, 405 So.2d 916 (Ala.1981)." Thomas, 566 So.2d at 741. In Barnes, Justice Beatty, writing for the court, stated:
"The first tier of the test promulgated by Mr. Justice Embry and adopted by this Court in Chavers establishes that the tort of bad faith refusal to honor a direct claim arises when there exists `no lawful basis for the refusal coupled with actual knowledge of that fact.' `No lawful basis,' as expressed in that opinion, means that the insurer lacks a legitimate or arguable reason for failing to pay the claim. See Michael v. National Security Fire & Casualty Co., 458 F.Supp. 128 (N.D.Miss.1978). That is, when the claim is not fairly debatable, refusal to pay will be bad faith and, under appropriate facts, give rise to an action for tortious refusal to honor the claim. Anderson v. Continental Insurance Co., 85 Wis.2d 675, 271 N.W.2d 368 (1978). When a claim is `fairly debatable,' the insurer is entitled to debate it, whether the debate concerns a matter of fact or law. `Coupled with actual knowledge of that fact' implies conscious doing of wrong. Bad faith, then, is not simply bad judgment or negligence. It imports a dishonest purpose and means a breach *304 of known duty, i.e., good faith and fair dealing, through some motive of self-interest or ill will.
"The second tier of the test is an elaboration on the first. The trier of fact, by finding, on the part of the insurer, an `intentional failure to determine whether or not there was any lawful basis for refusal,' may use that fact as an element of proof that no lawful basis for refusal ever existed. The relevant question before the trier of fact would be whether a claim was properly investigated and whether the results of the investigation were subjected to a cognitive evaluation and review. Implicit in that test is the conclusion that the knowledge or reckless disregard of the lack of a legitimate or reasonable basis may be inferred and imputed to an insurance company when there is a reckless indifference to facts or to proof submitted by the insured. Of course, if a lawful basis for denial actually exists, the insurer, as a matter of law, cannot be held liable in an action based upon the tort of bad faith. Otherwise, the insurer's knowledge of the non-existence of any debatable reasons for refusal would be a question for the finder of fact, i.e., the jury."
405 So.2d at 924.
Justice Houston also acknowledged that in National Security Fire & Casualty Co. v. Bowen, 417 So.2d 179, this Court established the elements of a bad-faith claim. Thomas, supra, 566 So.2d at 742. In Bowen, this Court stated:
"[T]he plaintiff in a `bad faith refusal' case has the burden of proving:
"(a) an insurance contract between the parties and a breach thereof by the defendant;
"(b) an intentional refusal to pay the insured's claim;
"(c) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);
"(d) the insurer's actual knowledge of the absence of any legitimate or arguable reason;
"(e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.
"In short, plaintiff must go beyond a mere showing of nonpayment and prove a bad faith nonpayment, a nonpayment without any reasonable ground for dispute. Or, stated differently, the plaintiff must show that the insurance company had no legal or factual defense to the insurance claim."
417 So.2d at 183 (emphasis in original).
Justice Houston then pointed out the following developments in the law of the tort of bad faith:
"Following the decisions in Chavers, Barnes, and Bowen, this Court established what is now known as the `directed verdict on the contract claim standard' in bad faith cases. See Burkett v. Burkett, 542 So.2d 1215, 1218 (Ala.1989). Writing for the Court in National Savings Life Ins. Co. v. Dutton, 419 So.2d 1357, 1362 (Ala.1982), Justice Shores stated:
"`As noted by both sides in this case, the tort of bad faith refusal to pay a valid insurance claim is in the embryonic stage, and the Court has not had occasion to address every issue that might arise in these cases. In [National Security Fire & Cas. Co. v. Bowen], we set out the elements of the tort and attempted to show the plaintiffs burden in these cases. It is a heavy burden. In the normal case in order for a plaintiff to make out a prima facie case of bad faith refusal to pay an insurance claim, the proof offered must show that the plaintiff is entitled to a directed verdict on the contract claim and, thus, entitled to recover on the contract claim as a matter of law. Ordinarily, if the evidence *305 produced by either side creates a fact issue with regard to the validity of the claim and, thus, the legitimacy of the denial thereof, the tort claim must fail and should not be submitted to the jury.'
The Dutton Court's characterization of a plaintiff's burden of proof as a `heavy' one was no doubt prompted by the Court's previous recognition in Chavers of the necessity for allowing insurers a broad range of freedom to thoroughly evaluate claims and to decline payment in nonmeritorious cases. However, keenly aware of the fact that there were countervailing policy considerations that weighed in favor of an insured's right to have his claim properly evaluated and promptly paid by the insurer, the Dutton Court, in articulating the standard to be applied in `normal' or `ordinary' bad-faith cases, allowed for a different standard to be applied in certain unusual or extraordinary cases. Justice Jones, concurring specially in Dutton, elaborated on the majority's opinion:
"`I concur completely with the opinion and write separately to elaborate on one point. The opinion correctly prefaces the "directed verdict on the contract claim" standard with the words "In the normal case"; and the phrase "if the evidence produced ... creates a fact issue ..." is preceded by the word "Ordinarily." These are significant qualifications. Certainly, extreme cases will arise in which a fact issue will present a jury question on that claim. This is not the case before us; and, absent such circumstances, the "directed verdict on the contract claim" is the applicable standard for testing the tort of bad faith claim.'
Later, Justice Jones, in his opinion concurring specially in Safeco Insurance Co. of America v. Sims, 435 So.2d 1219, 1224 (Ala.1983), wrote:
"`This "directed verdict on the contract claim" test is not to be read as requiring, in every case and under all circumstances, that the tort claim be barred unless the trial court has literally granted plaintiffs motion for a directed verdict on the contract. Indeed, the words "entitled to a directed verdict" so indicate. Rather, this test is intended as an objective standard by which to measure plaintiffs compliance with his burden of proving that defendant's denial of payment was without any reasonable basis either in fact or law; i.e., that defendant's defense to the contract claim is devoid of any triable issue of fact or reasonably arguable question of law.
"`Exceptions to the "directed verdict" rule will undoubtedly arise. Take the case where the insurer insists that its refusal of payment was grounded solely on a particular entry in a hospital record, and plaintiff denies the very existence of such an entry. Merely because the insurer may be able to withstand a directed verdict motionthe existence vel non of the record entry itself being an issue of factwould not, as a matter of law, bar the plaintiffs tort claim. This extreme example is to be distinguished from the more normal situation in which the factual dispute centers around the reasonable, but conflicting, inferences that may be drawn from a hospital record entry. If the entry in fact exists and one of the reasonable inferences of fact which may be drawn therefrom supports a legal basis for denial of the claim, Plaintiff would not be entitled to a directed verdict on the contract claim; thus, the claimant would be barred from proceeding with his tort of bad faith claim, even though the issue of fact may be resolved adversely to the insurer and the contract benefits awarded to the insured.
"`Because of its potential relevance, one additional exception to the "directed *306 verdict" test is suggested: Take the case of the insurer whose refusal of payment is based solely upon a legal position with respect to the controlling principles of law and its application to the undisputed facts giving rise to the claim. While the insurer, under the guise of asserting a legitimate defense, could not be heard to take issue with clear, well settled, elementary principles of contract law, certainly the rule of reasonableness dictates a field of operation for a denial of benefits based upon arguable legal grounds which are fairly debatable, even though the trial judge may correctly reject such arguments and direct a verdict for the insured.
"`Thus, as we have seen, Dutton's use of the terms "In the normal case" and "Ordinarily" allows for exceptions to the "entitled to a directed verdict" test. In the first example, the insured may proceed with his bad faith claim even though he was not entitled to a directed verdict; and in the second example, the insurer would be entitled to a judgment on the tort claim even though the insured was entitled to a directed verdict on the contract claim. Certainly these rare exceptions will not be difficult to recognize, nor will the general rule, because of rare exceptions, be difficult to apply.' (Emphasis in original.)"
Thomas, supra, 566 So.2d at 742-44.
Later in the Thomas opinion, Justice Houston went on to cite examples of what the Court had, at that time, deemed "unusual or extraordinary cases." These examples included cases in which the evidence showed that the insurer "intentionally or recklessly failed to properly investigate the claim or to subject the results of the investigation to a cognitive evaluation and review." 566 So.2d at 744. See, e.g., Aetna Life Ins. Co. v. Lavoie, 505 So.2d 1050 (Ala.1987); Continental Assurance Co. v. Kountz, 461 So.2d 802 (Ala.1984). Other examples included cases in which the insurer "created" a factual issue that could have defeated the insured's tort claim under the "directed-verdict-on-the-contract-claim" standard. See, e.g., United American Ins. Co. v. Brumley, 542 So.2d 1231 (Ala.1989); Jones v. Alabama Farm Bureau Mut. Cas. Co., 507 So.2d 396 (Ala.1986).
After Thomas, another "unusual or extraordinary" case arose. In Blackburn v. Fidelity & Deposit Co., 667 So.2d 661, 669 (Ala.1995), this Court recognized that the "directed-verdict-on-the-contract-claim" standard did not apply when an insurer, in an attempt to defeat the insured's preverdict motion for a JML, relied on its own "subjective belief that a portion of its insurance contract preclude[d] coverage." The Court stated that the exception was necessary to prevent insurers from relying on ambiguous portions of a policy as an absolute defense to a claim of bad faith. Id.; see also Loyal Am. Life. Ins. Co. v. Mattiace, 679 So.2d 229, 237-38 (Ala.1996), cert. denied, 519 U.S. 949, 117 S.Ct. 361, 136 L.Ed.2d 252 (1996); Employees' Benefit Ass'n v. Grissett, 732 So.2d 968 (Ala. 1998).
The "unusual or extraordinary" case was then referred to as the "abnormal" bad-faith case, and the "directed-verdict-on-the-contract-claim" case was called the "normal" bad-faith case. See Mattiace, supra, 679 So.2d at 241 (Maddox, J., dissenting); State Farm Fire & Cas. Co. v. Crumpton, 708 So.2d 136 (Ala.1997) (Houston, J., dissenting); Grissett, supra, 732 So.2d at 976. Thus, a plaintiff must establish that his or her claim is either the normal case or the abnormal case of bad faith. To this date, the abnormal cases have been limited to those instances in which the plaintiff produced substantial evidence showing that the insurer (1) intentionally or recklessly failed to investigate the plaintiffs claim; (2) intentionally or recklessly failed to properly subject the plaintiffs claim to a cognitive evaluation or review; (3) created its own debatable reason for denying the plaintiff's claim; or (4) *307 relied on an ambiguous portion of the policy as a lawful basis to deny the plaintiff's claim.

2. The Parties' Contentions
State Farm first contends that it was entitled to a preverdict JML on the Slades' contract claim. It says that although it prevailed on the contract claim, a preverdict JML on the contract claim would have prevented the bad-faith claim from going to the jury, because a prerequisite for bad-faith liability is contractual coverage. State Farm maintains that it was entitled to a preverdict JML on the breach-of-contact claim because the exclusion for earth movement unambiguously excludes coverage for damage caused in any way by earth movement. It contends that under any theory presented by the Slades to prove coverage, earth movement occurred in the chain of events causing the Slades' loss, and thus, under the terms of the policy, there was no coverage for the loss.
State Farm also argues that the trial court erred in denying its preverdict motions for JML on the Slades' bad-faith claim. State Farm says that it had a legitimate basis to deny the Slades' claim for insurance benefits because it had evidence that the damage to the Slades' home was not caused by lightning but was caused by poor construction and the shifting of soil under the Slades' home. It maintains that each of these events was an event not covered under the policy. State Farm also argues that the unambiguous earth-movement exclusion gave it a legitimate basis to deny the Slades' claim for insurance benefits.
State Farm also contends that because the jury found that the damage to the Slades' home was not covered under the policy, the trial court was required to grant its postverdict motion for JML. State Farm says that liability on a breach-of-contract claim is a prerequisite for liability on a bad-faith claim because the tort of bad faith requires a finding of a breach of an insurance contract.
We begin with State Farm's contention that it was entitled to a JML on all aspects of the Slades' breach-of-contract claim. We address only those portions of the breach-of-contract claim that went to the jury, and not the portion of that claim alleging collapse coverage, on which the trial court granted State Farm a JML and which is the subject of the Slades' cross-appeal.
The Slades attempted to prove that a lightning strike either directly or indirectly caused the damage to their home and that, according to the terms of their policy with State Farm, the damage was a loss that State Farm should have covered. As noted above, the Slades maintain that the following section of their policy provides coverage for their loss:
"SECTION I LOSSES INSURED

"COVERAGE ADWELLING

"1. We cover:
"a. the dwelling used principally as a private residence on the residence premises shown in the Declarations. This includes structures attached to the dwelling.
". . . .
"We insure for accidental direct physical loss to the property described in Coverage A, except as provided in SECTION ILOSSES NOT INSURED.

"COVERAGE BPERSONAL PROPERTY

"We insure for accidental direct physical loss to property described in Coverage B caused by the following perils, except as provided in SECTION ILOSSES NOT INSURED.

"1. Fire or lightning."
(Emphasis in original.) The Slades contend that they produced substantial evidence indicating that lightning caused "direct physical loss," i.e., the cracking in their home. They argue that this evidence consists of expert testimony and investigative *308 reports that state that lightning caused the damage to their home.
The Slades rely on the same three theories that they say they presented to the jury. The first theory was that the retaining wall was a part of the "dwelling" under the policy and that because the lightning directly struck the retaining wall, it directly struck the dwelling. Under this theory, the Slades maintain that because the lightning directly struck their dwelling, the earth-movement exclusion in the policy did not come into play. The Slades point to the testimony of their expert and the testimony of State Farm's agents who stated that if lightning directly struck the Slades' home, then the loss was covered. They also point to evidence showing that State Farm paid for the replacement of the retaining wall and the damage to their pool under Section I, Coverage A, supra, and they contend that this evidence shows that State Farm considered the retaining wall to be part of the dwelling.
The Slades' second theory was that the lightning caused the soil movement that resulted in the cracking in their home. The Slades maintain that they presented reports from various engineers and soil experts indicating that the lightning did cause soil movement that resulted in the cracking in their home.
The Slades say that their third theory was supported by their lightning expert, Richard Kithill, who testified at trial. Mr. Kithill testified that, in his opinion, the lightning struck the Slades' retaining wall and then traveled through the ground and into the metal rebar used to strengthen the concrete in the Slades' home. From there, Kithill said, the lightning caused "explosions due to water in [the concrete], and leading to the degradation of the ability of the slab to act as a foundation to the house and support the house." Kithill based his opinion on his scientific knowledge that saturated ground often acts as a conductor of lightning. He also based his opinion on a study that he had conducted for the Federal Government in which he had found similar damage that had occurred to underground concrete bunkers with metal rebar, bunkers that had also been struck by lightning.
State Farm responds to these theories as follows: First, State Farm argues that the term "dwelling" in the Slades' policy is not ambiguous and does not include the retaining wall. It maintains that there is a difference between the definition of the term "dwelling" and the "dwelling coverage" provided in Section I, Coverage A, of the Slades' policy and that it paid for the loss of the retaining wall because it was a "connected structure," which State Farm says was covered under "dwelling coverage" but was not part of the dwelling itself.
The issue whether a contract is ambiguous or unambiguous is a question of law for a court to decide. McDonald v. U.S. Die Casting & Dev. Co., 585 So.2d 853, 855 (Ala.1991). "If the terms within a contract are plain and unambiguous, the construction of the contract and its legal effect become questions of law for the court...." Id. Because the question is one of law, we must make our own determination as to whether this portion of the Slades' policy is ambiguous or unambiguous.
"The test to be applied by [a] court in determining whether there is ambiguity is not what the insurer intended its words to mean, but what a reasonably prudent person applying for insurance would have understood them to mean." Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 21:14, pp. 21-23 (3d ed.1997); see, also, Western World Ins. Co. v. City of Tuscumbia, 612 So.2d 1159, 1161 (Ala.1992) (same); St. Paul Fire & Marine Ins. Co. v. Edge Memorial Hosp., 584 So.2d 1316, 1322 (Ala.1991) (stating that language in an insurance policy should be given the same meaning that an ordinary person, not a lawyer, would reasonably ascribe to the language). The terms of an insurance policy are ambiguous only if the *309 policy's provisions are reasonably susceptible to two or more constructions or there is reasonable doubt or confusion as to their meaning. See United Services Auto. Ass'n v. Smith, 57 Ala.App. 506, 329 So.2d 562 (Ala.Civ.App.1976). In determining whether an ambiguity exists, a court should apply the common interpretation of the language alleged to be ambiguous. See Alabama Farm Bureau Mut. Cas. Ins. Co. v. Goodman, 279 Ala. 538, 541, 188 So.2d 268, 270 (1966). This means that the terms of an insurance policy should be given a rational and practical construction. Green v. Merrill, 293 Ala. 628, 308 So.2d 702 (1975). Also, a court cannot consider the language in the policy in isolation, but must consider the policy as a whole. Turner v. United States Fidelity & Guar. Co., 440 So.2d 1026 (Ala.1983).
In the present case, we must determine whether the term "dwelling" is unambiguous when applied to the facts of this case. State Farm maintains that the term "dwelling" unambiguously means only the parts of a building in which people reside. The Slades say that it is reasonable to conclude that an ordinary person would have understood the term "dwelling" to mean all the parts of a home that are necessary to the structural integrity of the home, including a retaining wall attached to the home that prevents the home from collapsing.
The policy states that State Farm covers "the dwelling used principally as a private residence on the residence premises shown in the Declarations. This includes structures attached to the dwelling." (Emphasis in original.) The term "dwelling" is not defined in the "Declarations" section or any other section of the Slades' policy. Thus, we cannot say that the policy, when examined as a whole, clearly defines the term "dwelling." In fact, the sentence "This includes structures attached to the dwelling," indicates that the term "dwelling" includes the Slades' retaining wall.
In determining the common meaning of the terms of an insurance policy, this Court has looked to dictionary definitions. See, e.g., Emergency Aid Ins. Co. v. Dobbs, 263 Ala. 594, 83 So.2d 335 (1955). However, dictionary definitions are not helpful in this case. In Webster's Third New International Dictionary (1971), "dwelling" is defined as "a building or construction used for residence: abode, habitation." In Miriam-Webster's Collegiate Dictionary (10th ed.1997), "dwelling" is defined as "a shelter (as a house) in which people live." These definitions do not indicate whether the term includes a structure such as an attached retaining wall. However, Couch on Insurance, supra, § 20:23, pp. 20-31, notes that "[t]he word `house,' as used in a policy of insurance[,] embraces everything integral to the structure." Thus, the common interpretations of the term "dwelling" leave us with a reasonable doubt as to the meaning of "dwelling" in the context of the facts of this case.[5]
Finally, following the rule in Green, supra, we must give the term a rational and practical interpretation. If we accepted State Farm's interpretation of the term "dwelling," then we would give the term an impractical meaning. The fallacy in State Farm's argument can be shown through reductio ad absurdum. Suppose, for example, that lightning struck the foundation of an insured's home and caused the foundation and the home sitting thereon to founder. Surely, we would not hold, as a matter of law, that something so integral to the structure of a home as the foundation is not part of the home or "dwelling" and that the insurance company need only pay for the damage to the foundation itself.
Accordingly, we conclude that the term "dwelling," when considered in light *310 of the facts of this case, is ambiguous. The policy does not define the term, but actually contains language indicating that the Slades' retaining wall is to be considered part of the dwelling. The common definitions of the term leave us with doubt as to the meaning of the term. Thus, we conclude that the issue whether the Slades' retaining wall was part of the dwelling was a fact question, and, therefore, that State Farm was not entitled to a preverdict JML on this portion of the Slades' breach-of-contract claim.
Second, State Farm argues that it was entitled to a preverdict JML on the Slades' second theory, i.e., that lightning caused the soil movement that resulted in the Slades' loss, because, State Farm argues, the earth-movement exclusion (quoted above) unambiguously excludes any loss caused in any way by earth movement. The Slades contend that the earth-movement exclusion is ambiguous and that it applies only to earth movement resulting from catastrophic events that normally involve earth movement, such as earthquakes and landslides. They point us to this Court's decision in Bly v. Auto Owners Insurance Co., 437 So.2d 495 (Ala. 1983).
In Bly, this Court was called upon to interpret an earth-movement clause similar to the one here. The Blys sought insurance coverage for damage to their house they claimed was caused by vibrations caused by several heavy logging trucks passing their home on a nearby road. Bly, 437 So.2d at 496. The Blys' insurance policy covered a "direct loss" caused by a vehicle, but excluded losses "`caused by, resulting from, contributed to or aggravated by any earth movement, including but not limited to earthquake, volcanic eruption, landslide, mudflow, earth sinking, rising or shifting.'" Id. The trial court entered a summary judgment in favor of the insurer. Id. at 496.
In interpreting the terms of the Blys' policy, this Court held "that the word `direct' means `immediate' or `proximate' and is not synonymous with physical contact." Id. Furthermore, the Bly court agreed that the language "any earth movement" was ambiguous.
"`It is a general rule of construction that exceptions to coverage must be interpreted as narrowly as possible in order to provide maximum coverage for the insured. Further, such exceptions must be construed most strongly against the company drafting and issuing the policy.'
". . . .
"In the instant case, the enumerated types of earth movement are all natural phenomena. While the policy states that the exclusion is not limited to the specified types of earth movement, it can reasonably be concluded that the intent was to include other natural phenomena involving earth movement. This conclusion is supported by the rule of ejusdem generis, `which ordinarily limits the meaning of general words and things to the class or enumeration employed.'
"The policy is at best ambiguous as to whether the vibrations caused by the passing vehicles constitute `earth movement' within the meaning of the exclusion."
437 So.2d at 496 (citations omitted). The Slades maintain that we must follow Bly and hold that State Farm's exclusion for earth movement is ambiguous. We disagree.
The language in the Slades' policy unambiguously excludes the Slades' loss. The earth-movement exclusion is not reasonably susceptible to two or more constructions. The language of the policy specifically states that a covered loss, such as a loss resulting from lightning, is excluded from coverage if the loss would not have occurred without earth movement. According to the policy, earth movement means the "shifting of ... earth." The Slades' second theory of liability under the contract is that lightning caused the soil to *311 shift or settle and that the shifting or settling resulted in the cracking in their home. According to the unambiguous terms of the contract, the Slades could not use this theory as a basis for contractual liability.
Furthermore, Bly is distinguishable from the present case. The earth-movement exclusion in this case is much broader than the exclusion in Bly. The exclusion in the Slades' policy is not limited to movement caused by natural events. It states that loss caused by earth movement is excluded regardless of the cause of the earth movement, "whether other causes acted concurrently or in any sequence with [earth movement]," or whether the earth movement arose from "natural or external forces." The exclusion also states that earth movement includes "the shifting ... of earth," unlike the clause in Bly, which did not define "earth movement." Therefore, we conclude that the earth-movement exclusion in the Slades' policy is unambiguous.
The Slades, however, argue that even if the earth-movement exclusion is unambiguous, it is unenforceable because, they say, it defeats the reasonable expectations of the parties. Specifically, the Slades argue that because one portion of their policy provides coverage for losses proximately caused by lightning, yet another portion, i.e., the earth-movement exclusion, takes away coverage for losses proximately caused by lightning when earth movement is in the chain of events that caused the insured's loss, a reasonable person would conclude that such a conflict would be resolved in favor of the insured.
The rule (or doctrine) of reasonable expectations of the parties is based on Aetna Casualty & Surety Co. v. Chapman, 240 Ala. 599, 200 So. 425 (1941). In Chapman, this Court embraced the following rule of construction:
"Policies of insurance being carefully prepared by the insurer, when containing provisions reasonably subject to different constructions, one favorable to the insurer and one favorable to the insured, the construction favorable to the insured shall prevail. As sometimes stated the insured is entitled to the protection which he may reasonably expect from the terms of the policy he purchases."
240 Ala. at 602, 200 So. at 426-27. However, the Chapman Court also stated:
"In giving effect to this rule, it is equally important that the contract made by the parties shall prevail, and no new contract be interpolated by construction.
"Provisions clearly disclosing their real intent are not to be given a strained construction to raise doubts where none reasonably exist. No citation of authority need be made in support of these well settled principles."
Id.
In Lambert v. Liberty Mutual Insurance Co., 331 So.2d 260, 263 (Ala.1976), a "stacking" case arising in regard to the statutorily mandated offer of uninsured-motorist coverage, this Court referred to Chapman and then stated:
"As Professor Keeton analyzes it, the principle of reasonable expectations insures that `[t]he objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations.' R. Keeton, Basic Text on Insurance Law § 6.3(a), at 351 (1971)."
(Emphasis in original.) Then the Court observed that its application of the rule of reasonable expectations in the context of stacking uninsured-motorist coverages allowed an insured to enjoy increased coverage because "where an expectation ... is in conflict with a limiting clause in the policy, the resulting ambiguity must be resolved in favor of the insured due to the nature of insurance contracts." Id. at 263.
*312 However, the Court found that Lambert was not within the zone of persons entitled to have a reasonable expectation of stacked coverages, because he was an employee of the purchaser of the policy. Id. at 263-65. The Court also held that Lambert was not a person required by statute to be covered under uninsured-motorist provisions and that the plain terms of the policy limited the amount of coverage provided for him; this, the Court held, was a separate basis for affirming the summary judgment for the insurer. Id. Given the Court's finding that Lambert was not within the zone of persons entitled to a reasonable expectation of stacked coverages and its finding of a separate basis for affirming, we must conclude that, to the extent Lambert is inconsistent with Chapman's requirement that, for the rule of reasonable expectations to apply, there be, as a predicate, doubts as to the real intent of the policy, the statements in Lambert are dicta.
Moreover, we are not here presented with separate provisions of an insurance policy each of which is unambiguous when read without reference to the other but, when read together, create a conflict giving rise to an ambiguity. Compare West American Ins. Co. v. Biggs, 348 So.2d 258 (Ala.Civ.App.1977). The State Farm policy at issue here clearly limits its coverage by citing the policyholder to a specific ensuing section of the policy that contains several exclusions from coverage. At least one court has found that such a reference gives the insured reasonable notice of the exclusion. See Kane v. Royal Ins. Co., 768 P.2d 678, 684 (Colo.1989).
Other courts have limited the use of the doctrine of reasonable expectations to situations in which an insurance policy is ambiguous. See, e.g., Rodriguez v. General Acc. Ins. Co., 808 S.W.2d 379, 381 (Mo.1991); Riffe v. Home Finders Assocs., Inc., 205 W. Va. 216, 517 S.E.2d 313 (1999). Furthermore, expectations that contradict a clear exclusion are not "objectively reasonable." Wellcome v. Home Ins. Co., 257 Mont. 354, 359, 849 P.2d 190, 194 (1993). Such a limit on the doctrine of reasonable expectations is necessary. Otherwise, this Court would be faced with the strong temptation to substitute its notion of equity for the unambiguous terms of a contract and the doctrine could be used to invalidate every policy exclusion. See Millar v. State Farm Fire & Cas. Co., 167 Ariz. 93, 97, 804 P.2d 822, 826-27 (Ct.App.1990), review denied, 168 Ariz. 144, 811 P.2d 1081 (Ariz.1991) ("If ... all that was required to defeat the operation of a policy exclusion under the reasonable expectation doctrine was a provision attempting to qualify or limit the scope of policy coverage, then every policy exclusion would be invalid as contrary to the insured's reasonable expectation of coverage.").
Accordingly, we conclude that the Slades' expectations of coverage do not require us to construe their policy so as to find coverage. Their expectations were limited by the unambiguous terms of their policy and therefore their expectations of coverage could not be "objectively reasonable." See Wellcome, supra. Moreover, because we are remanding this case for further proceedings on the issue of coverage, we cannot say that the contract is unconscionable. Unless the terms of an exclusion so narrowly restrict coverage as to render the contract unconscionable, the Legislature, and not the Court, is the proper forum for correction of what some may deem to be an excessively broad exclusion. This is particularly true in a case such as this one, in which the coverage is not mandated by a legislative statement of public policy, such as, for example, the statutory requirement that automobile-liability insurers offer uninsured-motorist coverage. Compare Lambert, supra. Therefore, we hold that the Slades' doctrine-of-reasonable-expectations argument does not provide a basis for finding coverage for the Slades' loss.
The Slades, however, argue that even if the earth-movement exclusion is *313 not contrary to their reasonable expectations, it is unenforceable because, they say, it violates the rule of "efficient proximate causation" adopted by this Court in Western Assurance Co. v. Hann, 201 Ala. 376, 78 So. 232 (1917). The Slades point out that their policy provides coverage for all losses directly caused by lightning. They maintain that under the rule of efficient proximate causation adopted in Hann, their loss was covered, regardless of whether the excluded event of earth movement was in the chain of events that caused their loss.
In Hann, an insured sued his insurer after the insurer denied his claim for damage to his building, after a wall from an adjacent building had fallen onto the insured's building. 201 Ala. at 379, 78 So. at 234. The wall that fell was part of a building that had burned four months earlier. Id. The wall was left standing until wind knocked it onto the insured's building. Id. The insured argued that his loss was covered because his insurance policy covered "all direct loss or damage by fire." Id., 201 Ala. at 377, 78 So. at 234. The jury returned a verdict for the insured. Id., 201 Ala. at 378, 78 So. at 234.
On appeal, the insurer argued that the trial court had erred in not directing a verdict in its favor. It maintained that the insured's loss was not caused by fire, but was caused by the falling of the wall and by the insured's negligence, both of which the insurer contended were not covered events. Id., 201 Ala. at 377-78, 78 So. at 234. This Court refused to reverse the judgment. Id., 201 Ala. at 381, 78 So. at 237.
This Court found that the term "direct" in the insured's policy meant "`immediate' or `proximate' as distinguished from `remote,'" and that issues of causation in insurance were not different from issues of causation in the law of negligence. Id., 201 Ala. at 378, 78 So. at 234. Thus, this Court determined that so long as the insured produced evidence indicating that the covered event, i.e., fire, was the proximate cause of his loss, then the jury's verdict could be upheld. Id. The Court examined the insured's proof of causation, according to the rule of efficient proximate causation:
"`The active efficient cause that sets in motion a train of events which brings about a result without the intervention of any force started, and working actively from a new and independent source, is the direct and proximate cause....'"
Id., 201 Ala. at 379, 78 So. at 235. Under that standard, the Court said, "[t]he jury was authorized to ... find from the evidence that the fire ... was in fact the proximate cause of the loss, and that the wind was but an intervening agency which could reasonably have been foreseen or anticipated, but an incident in the chain of events." Id., 201 Ala. at 380, 78 So. at 236.
Basing their argument on the efficient-proximate-causation rule, the Slades argue that they produced evidence that lightning was the "efficient proximate cause" of their loss and that earth movement was "but an incident in the chain of events." They maintain that we cannot accept State Farm's interpretation of the earth-movement exclusion because to do so, they say, would violate the efficient-proximate-causation rule, which they say provides that incidental events, such as earth movement in this case, cannot bar coverage of a loss proximately caused by a covered event.
The issue is basically one of contract and can be stated as whether a provision in an insurance policy that is contrary to a rule of law is enforceable or whether the contract must fall to the rule of law. In Alabama, insurance companies and their insureds are free to agree to any terms in a contract "so long as they do not offend some rule of law or contravene public policy." Northam v. Metropolitan Life Ins. Co., 231 Ala. 105, 106, 163 So. 635, 636 (1935). Thus, if the rule of efficient proximate causation states a principle of public policy, then State Farm's efforts to draft a *314 policy with coverage narrower than the rule allows must be struck down.
However, we conclude that the efficient-proximate-cause rule does not state a principle of public policy. The Hann Court was simply confronted with a problem in interpretation of policy language. The Court employed the rule of efficient proximate causation to construe the sparse terms of the policy before it. The Court did not adopt the rule as a principle of public policy, and this Court has not done so since Hann was decided. To elevate the efficient-proximate-causation rule to a principle of public policy today would invade the province of the Legislature, because it has delegated to the Commissioner of the Department of Insurance the responsibility of supervising insurance policies. See § 27-14-9, Ala.Code 1975 (stating that "[t]he commissioner may disapprove any [insurance policy] filed under Section 27-14-8 [(which includes a property-insurance policy)] or withdraw any previous approval thereof only if the [policy]... (5)[c]ontains provisions which are unfair, or inequitable or contrary to the public policy of this state or which would, because such provisions are unclear or deceptively worded, encourage misrepresentation").
Some courts have chosen to invalidate policy language inconsistent with the rule of efficient proximate causation in situations in which the policy clearly contradicts the rule. See, e.g., Safeco Ins. Co. v. Hirschmann, 112 Wash.2d 621, 773 P.2d 413 (1989); Garvey v. State Farm Fire & Cas. Co., 48 Cal.3d 395, 770 P.2d 704, 257 Cal.Rptr. 292 (1989). Others have declined to rewrite policy provisions. See, e.g., Millar v. State Farm Fire & Cas. Co., supra; Kane v. Royal Ins. Co., supra. We have a long-standing rule against rewriting unambiguous insurance policies "so long as they do not offend some rule of law or contravene public policy." Northam, supra. We adhere to that rule today and conclude that the rule of efficient proximate causation adopted in Hann, supra, does not require us to invalidate the earth-movement exclusion, which indicates State Farm's efforts to contract for narrower coverage. Accordingly, we hold that State Farm was entitled to a preverdict JML on the Slades' second theory, i.e., that lightning caused the soil movement that resulted in the Slades' loss, because the earth-movement exclusion unambiguously excludes coverage for any loss caused in any way by earth movement and because that exclusion is enforceable.
We now turn to State Farm's third contention: that it was entitled to a preverdict JML on the Slades' third theory, i.e., that their loss was covered because lightning moved through the saturated ground and struck the slab of their home. State Farm attempts to discredit Kithill's testimony by calling it "science fiction." However, State Farm does not argue that Kithill's testimony was improperly admitted. We conclude that Kithill's testimony created a factual question as to whether the lightning directly struck the Slades' home, and that the portion of the Slades' contract claim based upon Kithill's testimony was properly submitted to the jury.
Therefore, the trial court properly submitted the Slades' first and third theories of breach of contract to the jury, but it should have entered a preverdict JML on the Slades' second theory. We must now determine what effect this holdingthat two aspects of the Slades' breach-of-contract claim were properly submitted to the juryhas on the Slades' bad-faith claim.
The Slades do not argue that their bad-faith claim falls within the normal case of bad faith, i.e., the case governed by the "directed-verdict-on-the-contract" standard, but they contend that this is an abnormal bad-faith case in which State Farm was guilty of bad faith because it did not properly investigate their claim and because State Farm relied on an ambiguous portion of their policy. The Slades say that the trial court properly submitted to the jury the following theories of their *315 bad-faith claim: (1) that State Farm denied their claim in bad faith because it did not investigate the possibility that the retaining wall was part of the "dwelling" and therefore the possibility that lightning directly struck their home; (2) that State Farm denied their claim in bad faith because it relied on an ambiguous portion of their policy, i.e., the earth-movement exclusion; and (3) that State Farm denied their claim in bad faith because it did not conduct a proper investigation into the possibility that the lightning struck the slab of the Slades' home.
State Farm contends that it was entitled to a preverdict JML on the Slades' bad-faith claim, and it has addressed all three aspects of the Slades' bad-faith claim. First, State Farm maintains that it could not be held liable for not investigating whether the Slades' retaining wall was part of the dwelling, because, it says, the issue whether the retaining wall was part of the dwelling was completely irrelevant because it investigated the Slades' loss and accumulated voluminous evidence indicating that the damage was caused by other noncovered losses, such as poor construction and earth movement. State Farm also argues that the term "dwelling" in the policy is unambiguous and does not include the Slades' retaining wall.
We have already determined that the term "dwelling," as used in the Slades' policy, is ambiguous. Thus, we need not address this issue again, and we must determine the effect of the ambiguity on the Slades' bad-faith claim.
"The absence of a debatable reason not to pay a claim cannot be grounded on the vagaries of construction of an ambiguity." Grissett, supra, 732 So.2d at 977. An insurer can be liable for the tort of bad faith when it fails to properly investigate the insured's claim. Thomas, supra. Here, the Slades produced substantial evidence, in the form of expert testimony, indicating that the term "dwelling" did include their retaining wall. They also presented substantial evidence indicating that State Farm did not investigate their claim properly. The Slades produced evidence indicating that State Farm never, in the course of its investigation, sent to their home someone who was qualified to conduct a lightning investigation. The Slades presented evidence indicating that State Farm never interviewed any of the witnesses present on the day lightning struck their retaining wall. The Slades presented expert testimony indicating that these omissions amounted to an improper investigation, on the basis that an investigation of a claim such as the Slades made required the use of a lightning expert. The Slades also presented evidence indicating that State Farm did not investigate lightning as a cause. The Slades produced evidence indicating that State Farm told its engineer, Buck Durham, to investigate a "possible soil problem" and that it did not tell Durham about the lightning strike. This evidence conflicted with State Farm's "Good Faith Claims Handling" video, which was admitted into evidence and which contained a statement that State Farm's claims-handling policy was to attempt to find coverage.
This evidence, the Slades say, shows that State Farm never investigated the possibility that lightning directly struck their dwelling, a fact, which if proven, would negate the application of the earth-movement exclusion. The Slades maintain that this failure created a question of fact as to whether State Farm properly investigated their claim, and, therefore, that the trial court properly submitted this portion of their bad-faith claim to the jury. We agree.
Furthermore, State Farm's argument on this point, i.e., that it cannot be held liable because it believes it properly investigated noncovered events and found evidence that noncovered events caused the Slades' loss, is unacceptable. An insurance company's duty to investigate does not extend only to those events that are not covered. As this Court stated in Lavoie, *316 supra, 505 So.2d at 1052-53, an insurance company has a "responsibility to marshal all ... facts" necessary to make a determination as to coverage "before its refusal to pay." (Emphasis in original.) This duty must include a duty to investigate a covered event that an insured claims has caused his loss. Otherwise, the duty to properly investigate, imposed by the law regarding the tort of bad faith and recognized in Barnes, supra, would be meaningless. Therefore, we reject State Farm's contention, and we hold that this portion of the Slades' bad-faith claim was properly submitted to the jury.
State Farm next contends that the trial court should have granted its preverdict motion for JML on the Slades' second theory of bad-faith liability, i.e., that lightning caused soil movement that resulted in the cracking in their home. State Farm says that the earth-movement exclusion unambiguously provides that the Slades' loss was not covered and therefore gave State Farm a legitimate basis to deny the Slades' claim. We have found that the earth-movement exclusion is unambiguous. Accordingly, State Farm was entitled to a preverdict JML on this portion of the Slades' bad-faith claim.
Third, State Farm argues that it was entitled to a preverdict JML on the Slades' third theory, i.e., that State Farm denied their claim in bad faith because it did not conduct a proper investigation into the possibility that lightning struck the slab of the Slades' home. State Farm contends that Kithill's testimony did nothing more than create a fact question with regard to the Slades' contract claim and was therefore insufficient to satisfy the preverdict-JML standard for normal bad-faith cases. As stated in Grissett, supra, in a normal case "the plaintiff's contract claim had to be so strong that the plaintiff would be entitled to a preverdict JML." 732 So.2d at 976. The Slades again argue that this is not a normal bad-faith case but that it is an abnormal bad-faith case because, they say, State Farm failed to properly investigate their claim.
As stated above, we have concluded that the Slades produced substantial evidence indicating that State Farm did not properly investigate their claim. Therefore, State Farm was not entitled to a preverdict JML on the third aspect of the Slades' bad-faith claim.
Next, State Farm contends that because the jury found that the damage to the Slades' home was not covered under the policy, when it found that State Farm had not breached its contract with the Slades, the trial court was required to grant its postverdict motion for JML. State Farm says that liability on a breach-of-contract claim is a prerequisite for liability on a bad-faith claim because, it says, the tort of bad faith requires a finding of a breach of an insurance contract.
The Slades argue that State Farm was not entitled to a postverdict JML on their bad-faith claim because, they say, they did not have to prevail on the breach-of-contract claim. They say that they did not have to prevail on the breach-of-contract claim for three reasons: (1) that the jury, by finding that State Farm acted in bad faith, implicitly found that coverage existed; (2) that in a bad-faith-failure-to-investigate claim, like this one, the jury need not find contractual coverage; and (3) that the tort of bad faith provides a cause of action separate and independent from the insurance contract, because the law imposes upon an insurance company a duty to act in good faith.
In asserting that their bad-faith claim is a bad-faith-failure-to-investigate claim and that State Farm failed to properly investigate their claim, the Slades argue that this Court has already recognized a scenario in which a defendant could prevail on the plaintiff's breach-of-contract claim, yet the jury could find that the defendant committed the tort of bad-faith refusal to pay an insurance claim. They maintain that this scenario could occur, as *317 they say it did here, when a defendant denies an insured's claim after intentionally failing to determine whether a lawful basis existed to deny that claim, and then justifies "its denial by gathering information which it should have had in the first place." Aetna Life Ins. Co. v. Lavoie, supra, 505 So.2d at 1053. The Slades say that in such a situation the insurer could present at trial evidence, gathered after the insurer had denied the insured's claim, showing that the insured's loss was not covered under the terms of the policy. This evidence, they maintain, might convince the jury that the insured's loss was not covered, thereby resulting in a verdict for the defendant on the breach-of-contract claim. They contend that such a finding would not preclude liability on the bad-faith claim because liability on that claim, they say, must be determined on the date of denial.[6]
In contending that the tort of bad faith provides a cause of action separate and independent from the insurance contract, on the basis that the law imposes upon an insurance company a duty to act in good faith, the Slades argue that an insured should be allowed to recover under the tort of bad faith in the absence of coverage, when the insured suffers extra-contractual damage resulting from the insurance company's bad-faith administration of the insured's claim. They say that a special relationship exists between the insurer and the insured and that the duties flowing from this relationship do not apply only when the insured files a covered claim. They also contend that an insurance company should not be allowed to adjust an insured's claim in any manner it chooses and yet escape liability if, after a thorough investigation, its determination of no coverage turns out to be correct. They point us to other jurisdictions that have recognized that liability for the tort of bad faith does not depend on the existence of contractual coverage. See, e.g., Deese v. State Farm Mut. Auto. Ins. Co., 172 Ariz. 504, 838 P.2d 1265 (Ariz.1992); Hatch v. State Farm Fire & Cas. Co., 842 P.2d 1089 (Wyo.1992).
After thoroughly reviewing Alabama law on the tort of bad faith, we are convinced that when this Court recognized the tort of bad faith, it intended to limit liability under that tort to those instances in which the insured's losses were covered under the policy.
In Chavers, supra, 405 So.2d at 4, this Court stated:
"`Every contract contains an implied in law covenant of good faith and fair dealing; this covenant provides that neither party will interfere with the rights of the other to receive the benefits of the agreement. Breach of the covenant provides the injured party with a tort action for `bad faith' notwithstanding that the acts complained of may also constitute a breach of contract.'"
(Quoting Childs v. Mississippi Valley Title Ins. Co., 359 So.2d 1146, 1152 (Ala.1978) (which had quoted an earlier case).) (Emphasis added.) In Blackburn, supra, 667 So.2d at 667, this Court explained that this statement of the law in Chavers meant that "a bad faith claim will lie for a failure to provide the benefits contracted for in an *318 insurance policy." (Emphasis added.) The Blackburn Court further stated:
"In Safeco Insurance Co. of America v. Sims, 435 So.2d 1219, 1222 (Ala.1983), this Court stated that `a cause of action for bad faith refusal to honor insurance benefits accrues upon the event of the bad faith refusal, or upon the knowledge of facts which would reasonably lead the insured to a discovery of the bad faith refusal.' Furthermore, in Vincent v. Blue Cross-Blue Shield of Alabama, 373 So.2d 1054, 1062 (Ala.1979), Justice Jones, in his special concurrence, noted that `for proof of bad faith there must be an absence of a reasonable basis for denial of policy benefits and the knowledge or reckless disregard of [a lack of] a reasonable basis for a denial....' (Citation omitted.)"
667 So.2d at 668 (emphasis in original; interpolation in Blackburn).
In dicta in National Security Fire & Casualty Co. v. Vintson, 414 So.2d 49, 52 (Ala.1982), when the tort of bad faith was in its infancy, this Court stated:
"A verdict under the claim of bad faith must necessarily find liability in contract for benefits currently due because the tort of bad faith refusal to pay a valid insurance claim is so defined that, unless the plaintiff is entitled to recover on the contract, a bad faith claim cannot be maintained."
We think it clear that these authorities limit bad-faith liability to those cases in which the insured is entitled to benefits under the policy. This conclusion is further supported by this Court's adoption of the "directed-verdict-on-the-contract" test in Dutton, supra. The establishment of this test indicates the link between contractual liability and bad-faith liability. Although this Court has recognized several abnormal cases of bad faith, that recognition did not eliminate the requirement that the plaintiff prove an entitlement to benefits under the insurance policy. As Justice Jones said in his special concurrence in Kountz, supra, 461 So.2d at 810, "[t]his exception [ (his term for the abnormal bad-faith case) ] strengthens, rather than weakens, the general rule."
Therefore, we reject the Slades' argument that in the abnormal bad-faith case in which the insurer fails to properly investigate the insured's claim contractual liability is not a prerequisite to bad-faith liability, and the Slades' argument that the tort of bad faith provides a cause of action that is separate and independent of an insurance contract. In so doing, we make it clear that in order to recover under a theory of an abnormal case of bad-faith failure to investigate an insurance claim, the insured must show (1) that the insurer failed to properly investigate the claim or to subject the results of the investigation to a cognitive evaluation and review and (2) that the insurer breached the contract for insurance coverage with the insured when it refused to pay the insured's claim.
This is nothing new. Under the elements established in Bowen, supra, the plaintiff has always had to prove that the insurer breached the insurance contract. Practically, the effect is that in order to prove a bad-faith-failure-to-investigate claim, the insured must prove that a proper investigation would have revealed that the insured's loss was covered under the terms of the contract. This result preserves the link between contractual liability and bad-faith liability required by Chavers, supra, and Dutton, supra.[7]
Having reached this conclusion, we must consider the propriety of the jury's verdict and the judgment entered thereon. On original submission, we held that the *319 Slades' failure to prevail on their breach-of-contract claim was fatal to their bad-faith claim and that the trial court should have entered a postverdict JML in favor of State Farm. We then rendered a judgment in favor of State Farm on the Slades' bad-faith claim.
In their rehearing application and at oral argument on that application, the Slades have argued that this Court should not have rendered a judgment in favor of State Farm but should have ordered a new trial, on the basis that the jury's verdict was inconsistent. The Slades maintain that the jury found a breach of contract when it found that State Farm had acted in bad faith. They point out that under Bowen, supra, one of the elements of the tort of bad faith is breach of an insurance contract. Thus, they contend that the jury's verdict is inconsistent because the jury found no breach of contract on the breach-of-contract claim but that it must have found such a breach on the bad-faith claim.[8]
First, we conclude that the Slades can present such an argument for the first time on rehearing. Rule 50(d), Ala. R. Civ. P., so provides:
"If the motion for judgment as a matter of law is denied, the party who prevailed on the motion may, as appellee, assert grounds entitling the party to a new trial in the event the appellate court concludes that the trial court erred in denying the motion for judgment."
Rule 50(d) also grants us the authority to award the appellee a new trial in a case in which we reverse the trial court's denial of a motion for JML. Rule 50(d) states:
"If the appellate court reverses the judgment, nothing in this rule precludes it from determining that the appellee is entitled to a new trial, or from directing the trial court to determine whether a new trial shall be granted."
The United States Supreme Court has held that such a procedure is allowed by Rule 50(d), Fed.R.Civ.P., which reads exactly the same as Rule 50(d), Ala. R. Civ. P. See Neely v. Martin K. Eby Constr. Co., 386 U.S. 317, 87 S.Ct. 1072, 18 L.Ed.2d 75 (1967). Therefore, we turn to the merits of the Slades' argument.
The trial court charged the jury in a manner consistent with Bowen, supra. Its charge required that, in order to find State Farm guilty of a bad-faith denial of the Slades' claim, the jury first had to find that State Farm had breached its contract of insurance with the Slades. Thus, the jury, in finding State Farm guilty of bad faith, must have found that State Farm had breached the insurance contract. See Holland v. City of Alabaster, 572 So.2d 431, 433 (1990) (stating that, absent evidence to the contrary, jurors are presumed to follow the trial court's instructions). On the Slades' breach-of-contract claim, however, the jury found in favor of State Farm. Thus, the jury inconsistently resolved the same issue in two separate counts, thereby making its verdict inconsistent.
"[I]t is clear that the appropriate remedy for the rendition of an inconsistent verdict is not a [postverdict JML]; rather, the appropriate remedy is a new trial." Luker v. City of Brantley, 520 So.2d 517, 521 (Ala.1987). Accordingly, we hold that the Slades are entitled to a new trial on their breach-of-contract and bad-faith claims. Because we have determined that State Farm was entitled to a preverdict JML on the aspect of the Slades' breach-of-contract and bad-faith claims alleging that lightning caused the soil movement that resulted in the Slades' loss, that aspect of the Slades' *320 claims shall not be retried. The issues regarding the aspects of the Slades' bad-faith and breach-of-contract claims alleging that the retaining wall was part of the dwelling and that lightning moved through the ground and struck the slab of the home shall be retried. Of course, if the case is retried and the jury finds State Farm guilty of a bad-faith refusal to pay an insurance claim, that finding must be supported by a finding of a breach-of-contract. We now turn to the portion of State Farm's appeal dealing with the Slades' fraud and suppression claims.

C. Fraud
The jury found in favor of the Slades on their claims of misrepresentation and suppression in the adjustment of their claim. State Farm argues that the trial court erred in refusing to grant its preverdict and postverdict motions for JML on these claims, for two reasons: (1) "that there is no separate tort for fraud or fraudulent suppression in the handling of a claim because the tort of bad faith covers the handling of the claim" and (2) that it was entitled to a JML on the Slades' claims of fraudulent misrepresentation and suppression.
First, we disagree with State Farm's contention that there is no separate tort of fraud or fraudulent suppression in the handling of an insurance claim. An insurer's conduct in connection with the denial of a claim made under its policy may support a fraud action even in a setting where the insured alleges a bad-faith refusal to pay a claim. Jones v. Alabama Farm Bureau Mut. Cas. Co., 507 So.2d 396, 401 (Ala.1986). To support such a claim, however, the insurer must have induced the insured to act, or to fail to act, in reliance on the alleged fraud. Id. at 401. Therefore, we must turn to State Farm's second contention.
State Farm argues that it was entitled to a JML on both fraud claims because, it says, the Slades did not justifiably rely on its alleged suppression and misrepresentation and because State Farm's conduct was not the proximate cause of their loss. The Slades argue that they relied to their detriment on State Farm's alleged misrepresentation and on its suppression, by delaying the repair on their home and thereby increasing their repair costs. The gravamen of the asserted misrepresentation is State Farm's statements that it was still investigating, when State Farm's internal records reflected a decision to deny the claim. The Slades argue that because of this misrepresentation, they were entitled to await State Farm's final decision before undertaking repairs to their home. State Farm contends that, as a matter of law, this delay cannot be reliance, for two reasons: (1) because, under the law and under their policy, the Slades had a duty to repair their home and (2) because, as a matter of law, the Slades should not be allowed to sit idle in hope of receiving money for repairs, when their policy unambiguously states that no coverage exists.
We begin by noting that the Slades filed this action before this Court decided Foremost Insurance Co. v. Parham, 693 So.2d 409 (Ala.1997). Thus, we must test the Slades' alleged reliance under the old "justifiable-reliance standard" established in Hickox v. Stover, 551 So.2d 259 (Ala.1989). In Hickox, this Court stated:
"`[R]eliance should be assessed by the following standard: A plaintiff, given the particular facts of his knowledge, understanding, and present ability to fully comprehend the nature of the subject transaction and its ramifications, has not justifiably relied on the defendant's representation if that representation is "one so patently and obviously false that he must have closed his eyes to avoid the discovery of the truth."'"
551 So.2d at 263 (quoting Southern States Ford, Inc. v. Proctor, 541 So.2d 1081, 1091-92 (Ala.1989)) (Hornsby, C.J., concurring specially).
On original submission, we concluded that even under the justifiable-reliance *321 standard, we could not find that the Slades justifiably relied on State Farm's alleged misrepresentation or suppression. We noted the following facts about the Slades' knowledge of the subject transaction: Mrs. Slade is a teacher and has a doctorate in elementary education. Mr. Slade ran several businesses, and he knew that State Farm had some questions about coverage for the damage to his home and that State Farm might not pay the claim. Furthermore, State Farm sent the Slades letters, one as early as February 2, 1994, telling the Slades that State Farm had questions about coverage and that State Farm would get back with them when it resolved those questions. Mrs. Slade testified that she read those letters but ignored them because, she said, she was convinced that their loss was covered. However, there is no evidence to indicate that State Farm ever lulled the Slades into believing that the damage to their home was covered. Based upon those facts, we found that the Slades did not justifiably rely on State Farm's representations.
On rehearing, the Slades contend that by focusing on the Slades' intelligence and understanding of the transaction we created a "sufficiently smart" standard that is not consistent with the justifiable-reliance standard or the reasonable-reliance standard. However, under the justifiable-reliance standard, the court must take into account "the particular facts of [the plaintiffs] knowledge, understanding, and present ability to fully comprehend the nature of the subject transaction and its ramifications." Hickox, supra. Therefore, we were correct in examining the evidence of the Slades' intelligence.
Also on original submission, we found the following: The Slades failed to produce substantial evidence indicating that State Farm's conduct proximately caused their loss. "A critical element of a fraud claim is that the plaintiffs damage or loss was a `proximate result of the alleged [fraud].'" City Realty, Inc. v. Continental Cas. Co., 623 So.2d 1039, 1043 (Ala.1993) (quoting Green Tree Acceptance, Inc. v. Standridge, 565 So.2d 38, 42 (Ala. 1990)). Also, where the plaintiffs loss is a result of the plaintiffs own failure to act, the plaintiffs loss is not proximately caused by the defendant's alleged fraud. City Realty, 623 So.2d at 1043.
We also found: It is undisputed that the Slades knew that the cracking in their home was worsening, but failed to take any action. Therefore, any increased damage to the Slades' home was caused by their own failure to act and not by State Farm's conduct. Furthermore, the Slades failed to produce any evidence, as required under Jones, supra, to indicate that State Farm induced them to act or induced them not to act.
On rehearing, the Slades again attempt to shift onto State Farm the burden of making repairs and preventing further loss to their home. They say that State Farm's fraudulent delay in payment relieved them of the duty to mitigate the damage to their home. They maintain that the evidence of State Farm's ongoing misrepresentations that it was attempting to determine the cause of the loss, when it fact it had internally denied their claim, was sufficient to support submitting their fraud claim to the jury. They also contend that they produced substantial evidence indicating that State Farm's suppression of the fact that it had denied their claim proximately caused them to suffer loss, specifically, an increased cost for the repair of the damage to their home. We disagree.
According to the Slades' policy, it was their duty to "protect the property from further damage or loss, [to] make reasonable and necessary temporary repairs required to protect the property, [and to] keep an accurate record of expenditures." Thus, the policy clearly placed on the Slades the burden to prevent further loss, and they cannot now hold their insurer liable for something they were required to do. Cf. Real Asset Management, Inc. v. *322 Lloyd's of London, 61 F.3d 1223, 1230 (5th Cir.1995) (holding that the insured's duty to mitigate does not terminate when the insurer breaches a duty to timely settle a claim). Furthermore, had the Slades requested and received permission to begin repairs (and there is no evidence that they requested, or were refused, permission) and had made them at their own expense, they could seek reimbursement for the cost of repairs under this policy.
Also on rehearing, however, the Slades have pointed us to another provision in their policy that says that they must "exhibit the damaged property" so long as State Farm "reasonably requires." They contend that this provision prevented them from making repairs to their home because, they say, as long as State Farm was requesting additional testing, they could not undertake repairs; otherwise, they say, the property would not be exhibited in its damaged condition. However, the Slades never asked State Farm if they could repair their home, nor did they attempt to repair their home. State Farm never told them that they could not repair their home, and in no way did it prevent them from beginning repairs. Therefore, we conclude that State Farm did nothing to relieve them of their duty to prevent further damage or loss. Accordingly, we hold that State Farm was entitled to a JML on the Slades' claims of fraud and suppression in the adjustment of their insurance claim.

D. Conclusion as to State Farm's Appeal
Having determined that State Farm was entitled to a new trial on certain of the Slades' breach-of-contract and bad-faith claims that went to the jury, and to a JML on the Slades' fraud claims that went to the jury, we need not address State Farm's other arguments.[9] The trial court's judgment entered in favor of the Slades on their breach-of-contract and bad-faith claims is reversed; on remand State Farm is entitled to a new trial on those issues not subject to the preverdict JML we have found State Farm was entitled to; and the judgment on the Slades' claims alleging fraud in the adjustment of their insurance claim is reversed and a judgment on those claims is rendered in favor of State Farm. Furthermore, because the Slades are no longer the prevailing party, we reverse the trial court's award of costs to the Slades.

II. The Slades' Cross Appeal
In their cross appeal, the Slades argue three errors: (1) that the trial court erred in granting State Farm's preverdict motion for a JML on their claims of fraud in the sale of their policy; (2) that the trial court erred in permitting evidence of the pro tanto release and a reduction of the verdict by the amount paid under that release; and (3) that the trial court erred in granting State Farm's motion for a JML on the issue of collapse coverage.

A. Fraud in the Sale of the Policy
The Slades contend that the trial court erred when it granted State Farm's preverdict motion for a JML on the Slades' claim that State Farm's agent, Chester Carr, had fraudulently induced them to buy State Farm's policy. They maintain that Carr misrepresented the extent of the coverage under their policy and suppressed the fact that the policy contained exclusions. They say that Carr stated to Mr. Slade that the Slades' policy was "an all-risk, full-coverage-on-everything" policy, and that that statement was a misrepresentation because in fact the policy contained exclusions, which they say Carr suppressed. They also say that Carr stated that the policy was "the Cadillac of all insurance" and that it was "the very best." They maintain that they relied on *323 those statements, by entering into the insurance contract, and that the reliance was to their detriment. They also claim that Carr fraudulently suppressed the fact that their policy would contain exclusions.
In granting State Farm's preverdict motion for a JML, the trial court held that the Slades could not have justifiably relied on Carr's statements because both Mr. and Mrs. Slade are well-educated, because they had entered into several insurance contracts before entering this one, and because they were put on notice of the exclusions in the policy because the exclusions were not hidden. The trial court also held that no confidential relationship existed between Carr and the Slades and, therefore, that Carr had no duty to tell the Slades about the exclusions.
First, we address the Slades' misrepresentation claim. To establish a claim of fraudulent misrepresentation under the old "justifiable-reliance" standard, a plaintiff must prove (1) that the defendant misrepresented a material fact; (2) that the misrepresentation was made either innocently or willfully to deceive, or was made recklessly without knowledge that it was false; (3) that the plaintiff, under the circumstances, justifiably relied upon the misrepresentation; and (4) that the plaintiff suffered injury as a proximate consequence of the reliance. Applin v. Consumers Life Ins. Co., 623 So.2d 1094 (Ala.1993), overruled on other grounds, Boswell v. Liberty Nat'l Life Ins. Co., 643 So.2d 580 (Ala. 1994).
The Slades contend that Carr misrepresented to them the extent of the coverage the policy would provide. Mr. Slade testified that he understood Carr's statements that their policy was an "all-risk, full-coverage-on-everything" policy to mean that there were no exclusions. In making this argument, the Slades cite Alabama Farm Bureau Mutual Casualty Insurance Co. v. Griffin, 493 So.2d 1379 (Ala.1986), in which this Court held that an agent's specific statements about coverage that were not true amounted to actionable fraud. However, Griffin is distinguishable from the present case. In Griffin, the plaintiff asked specific questions about insurance coverage and the agent made specific misrepresentations about the scope of coverage. Here, the Slades never asked Carr whether the policy contained any exclusions, and Carr did not tell Mr. Slade that the policy did not contain any exclusions. Therefore, Carr did not misrepresent the scope of the Slades' coverage.
We also conclude that the Slades could not have justifiably relied on Carr's other statements because these other statements amounted to nothing more than mere "puffery," in light of the Slades' level of education and degree of sophistication. See McGowan v. Chrysler Corp., 631 So.2d 842, 846 (Ala.1993) (salesman's statements to sophisticated purchaser that automobile was a "top-of-the-line" car and a "smooth-riding" car were considered "puffery," under the justifiable-reliance standard). Therefore, we agree with the trial court that, as a matter of law, the Slades did not justifiably rely on any misrepresentation by Carr. Accordingly, the trial court did not err when it entered a preverdict JML on the Slades' misrepresentation claim.
Second, we address the Slades' contention that the trial court erred when it entered a JML for State Farm on their fraudulent-suppression claim. The Slades maintain that Carr had a duty to disclose to Mr. Slade, at the time of the sale, the fact that their policy contained exclusions and that his failure to do so caused them to rely to their detriment by purchasing the insurance policy.
To establish a claim of fraudulent suppression, a plaintiff must produce substantial evidence establishing the following elements: (1) that the defendant had a duty to disclose an existing material fact; (2) that the defendant suppressed that existing material fact; (3) that the defendant had actual knowledge of the fact; (4) that the defendant's suppression of the fact induced the plaintiff to act or to refrain from *324 acting; and (5) that the plaintiff suffered actual damage as a proximate result. Booker v. United Am. Ins. Co., 700 So.2d 1333, 1339 (Ala.1997); Dodd v. Nelda Stephenson Chevrolet, Inc., 626 So.2d 1288, 1293 (Ala.1993).
In reviewing this issue, we note that neither the parties nor the trial court had the benefit of our recent decision in State Farm Fire & Casualty Co. v. Owen, 729 So.2d 834 (Ala.1998), in which we held that the question whether one has a duty to disclose is a question of law. Although the trial court did not have the benefit of Owen, it followed the rule adopted in that case and held that, as a matter of law, Carr did not have a duty to disclose to Mr. Slade the existence of exclusions in the Slades' policy. We now must determine whether that holding was correct.
Generally, mere silence does not constitute fraud. However, § 6-5-102, Ala.Code 1975, establishes two situations in which a duty to speak could arise: "from the confidential relations of the parties or from the particular circumstances of the case." The Slades do not contend that their relationship with State Farm was a confidential one. Therefore, we must determine whether a duty to speak arose from the circumstances of this case. In ascertaining whether the circumstances of the case created a duty to disclose, "we must consider a number of factors: (1) the relationship of the parties; (2) the relative knowledge of the parties; (3) the value of the particular fact; (4) the plaintiffs opportunity to ascertain the fact; (5) customs of the trade; and (6) other relevant circumstances." Owen, 729 So.2d at 842-43. Moreover, we must examine the relationship or circumstances at the time of the alleged suppression. Id.
After examining these factors and the facts of this case, we conclude that the trial court correctly held that Carr did not have a duty to disclose the existence of exclusions in the Slades' policy. Although the Slades say that they had dealt with Carr several times before and had with him what they describe as a trustworthy relationship, Mr. Slade was a knowledgeable businessman. Mr. Slade owned several businesses and had entered into several insurance contracts before. Thus, he "did not come to the table without any knowledge of insurance practices." Owen, 729 So.2d at 843.[10] Furthermore, although the value of the fact at issue, i.e., the fact that the policy had exclusions, was important, Mr. Slade could have ascertained the existence of that fact. This case is like Owen, in that there was no evidence that Mr. Slade inquired into the scope of coverage or asked any questions regarding the existence of exclusions. There was no evidence that State Farm or Carr prevented him from obtaining this information or from viewing the policy before purchasing it. Mr. Slade could have done any of these things. Moreover, he had purchased several insurance policies before; this fact would indicate that he knew that insurance policies contain exclusions. Therefore, the trial court properly determined that Carr had no duty to disclose the existence of exclusions in the Slades' policy; the court properly entered a preverdict JML on the Slades' suppression claim.

B. The Pro Tanto Release

As to the pro tanto release, the Slades first argue that the trial court should not have allowed State Farm to plead or to prove the fact that the Slades had entered into a settlement with the construction defendants because, they say, State Farm and the construction defendants were not joint tortfeasors.
"[A]s a matter of law, [defendants who are not joint tortfeasors and] whose acts do not combine to cause one single injury *325 cannot claim a set-off ... [as to] any amount received by the plaintiff in settlement with other [defendants who are not joint tortfeasors] based on distinct acts of those defendants." Ex parte Martin, 598 So.2d 1381, 1385 (Ala.1992); see, also, Hall v. Seaboard Air Line R.R., 211 Ala. 602, 604, 100 So. 890, 891 (1924) ("`where the [negligent acts] of two or more persons concur in producing a single, indivisible injury, then such persons are jointly and severally liable'"). In the present case, there was no "single, indivisible injury" caused by the construction defendants and State Farm. In fact, there were two injuries flowing from two separate allegedly tortious acts: (1) damage caused by the alleged negligent and/or wanton construction that was done by the construction defendants and (2) damage caused by the alleged bad-faith refusal to pay an insurance claim. Also, the injuries the Slades claim to have suffered were not indivisible. Moreover, the acts of the two groups of defendants did not combine to cause any one injury. State Farm took no part in the construction of the home, and the construction defendants took no part in the refusal to pay an insurance claim. Accordingly, the construction defendants and State Farm were not joint tortfeasors, and the trial court should not have allowed State Farm to claim a set-off of any amount received by the Slades in the settlement with the construction defendants. Thus, State Farm should not have been allowed to plead or to put into evidence the existence and the terms of the Slades' settlement with the construction defendants for the purpose of achieving a set-off as the result of a pro tanto settlement. Whether the evidence was admissible for some other purpose is not before us.
The Slades also argue that the trial court erred in not allowing them to admit into evidence a copy of the pro tanto settlement and that the trial court erred in not allowing their counsel to question them regarding the terms of the settlement. They contend that under the doctrine of curative admissibility the evidence was admissible. Thus, they say that they are entitled to a new trial because of these erroneous rulings by the trial court. Because we have already determined that the Slades are entitled to a new trial and because we have already determined that the trial court should not have allowed State Farm to put into evidence the terms of the settlement, for the purpose of securing a set-off as a result of the pro tanto settlement, we need not address this issue.

C. Collapse Coverage
On original submission, the Slades argued that the trial court erred when it granted State Farm's preverdict motion for a JML on the issue of coverage for collapse. They contended that their policy provided coverage for losses involving collapse of a building or part of a building, caused by lightning. The Slades maintained that they produced substantial evidence indicating that the damage to their home is covered under the collapse provision of their policy.
We noted that the Slades' policy states that "[c]ollapse does not include settling, cracking, shrinking, bulging or expansion." We also recognized that this Court long ago determined that the term "collapse" is unambiguous and does not include settling or cracking in a home. See Central Mut. Ins. Co. v. Royal, supra, 269 Ala. at 373-75, 113 So.2d at 682-83. We quoted the rule that "[w]hen the language of an insurance policy is clear and unambiguous it must be construed as it reads." Id., 269 Ala. at 375, 113 So.2d at 683. Accordingly, we held that the Slades did not produce any evidence of property damage other than the settling of their home and the cracking in the home, and held that the trial court properly granted State Farm's preverdict motion for a JML on the issue of collapse coverage.
On rehearing, the Slades contend that we overlooked the case of Fidelity & Casualty Co. of New York v. Mitchell, 503 So.2d 870, 871 (Ala.Civ.App.1987), in which the Court of Civil Appeals distinguished *326 Royal and held that collapse coverage could cover damage to a home that had not actually fallen to "a flattened form or rubble." However, Mitchell is distinguishable from the present case.
In Mitchell, the plaintiff presented evidence indicating that parts of the insured home had actually collapsed, that the staircase had pulled apart from the walls, and that the floors of the home were no longer able to support the weight of people because of damage that had been caused by termites. 503 So.2d at 871. The Court of Civil Appeals found that Royal, supra, was factually distinguishable in that the plaintiff in Mitchell produced evidence indicating that the structural integrity of the building had been destroyed and that the home was not fit for human habitation (evidence the plaintiff in Royal did not produce). Id.[11] Thus, that court concluded that the evidence presented by the Mitchell plaintiff was sufficient to support the trial court's finding of coverage. Id.
In the present case, the Slades point to no evidence indicating that any part of their home had actually fallen in, i.e., collapsed, or that the structural integrity of their home was so damaged that their home was unfit for human habitation. Therefore, we again hold that the damage to the Slades' home did not fit within the definition of the term "collapse" as it is used in their insurance policy.
Also on rehearing, the Slades argue that their policy provides coverage for losses involving collapse of a building or part of a building caused by "use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation." They say that they presented substantial evidence indicating that the damage to their home was caused during the reconstruction of their retaining wall and the replacement of soil near their home. Nevertheless, such an argument still does not bring their loss into the definition of the term "collapse." Moreover, the Slades presented no evidence indicating that the reconstruction proximately caused their loss. The only evidence of proximate cause that they have pointed to is testimony from State Farm's expert indicating that the reconstruction "could have contributed" to the Slades' loss. This testimony is not sufficient to create a question of fact under the "more-probable-than-not" or "more-likely-than-not" standard required for expert testimony. J.B. Hunt Transport, Inc. v. Credeur, 681 So.2d 1355, 1361 (Ala.1996). Therefore, we must reject the Slades' final argument, and we conclude that the trial court properly entered a preverdict JML for State Farm on the Slades' claim for collapse coverage.

III. Conclusion
The judgment in favor of the Slades on their claims alleging breach of contract and bad faith is reversed, and the case is remanded for a new trial on all breach-of-contract and bad-faith issues that originally went to the jury, other than the issues relating to the Slades' claims that lightning caused soil movement. The judgment in favor of the Slades on their claims alleging fraud in the adjustment of their insurance claim is reversed, and a judgment is rendered in favor of State Farm on those claims. The order awarding costs is reversed. The judgment on the Slades' claims alleging fraud in the sale of their insurance policy and a breach of contract in regard to collapse coverage is affirmed. The trial court's ruling on the issue of the pro tanto release that is the subject of part of the Slades' cross appeal is reversed.
APPLICATION GRANTED; OPINION OF FEBRUARY 12, 1999, WITHDRAWN; OPINION SUBSTITUTED.
1961769 (THE APPEAL)REVERSED IN PART AND JUDGMENT
*327 RENDERED; REVERSED IN PART AND REMANDED.
1961770 (THE CROSS APPEAL) AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
HOOPER, C.J., and MADDOX, HOUSTON, BROWN, and JOHNSTONE, JJ., concur.
NOTES
[1] The applicable portion of the Slades' policy reads:

"SECTION I LOSSES INSURED
"COVERAGE ADWELLING
"1. We cover:
"a. the dwelling used principally as a private residence on the residence premises shown in the Declarations. This includes structures attached to the dwelling.
". . . .
"We insure for accidental direct physical loss to the property described in Coverage A, except as provided in SECTION I LOSSES NOT INSURED.
"COVERAGE BPERSONAL PROPERTY
"We insure for accidental direct physical loss to property described in Coverage B caused by the following perils, except as provided in SECTION ILOSSES NOT INSURED.
"1. Fire or lightning."
(Emphasis in original.)
[2] In fact, by February, the cracking in the Slades' home had become quite severe and included cracks in the brick veneer on all sides of the house, cracking of floors and tiles, and other serious damage.
[3] "Soil compacting" is done when the natural soil upon which a house is to be built is unstable. The process involves removing the natural soil and then replacing it with a compacted, imported soil fill to ensure stability of the home's foundation. The tests are performed to confirm that the compacted soil is sufficiently stable to support the house.
[4] Effective October 1, 1995, Rule 50, Ala. R. Civ. P., was amended, as a matter of form only, so as to rename "motions for directed verdict" and "motions for judgment notwithstanding the verdict" as "motions for judgment as a matter of law." Rather than continue to use the terminology of the former rule, which terminology is sometimes used in the briefs and the record in this case, we have used in this opinion the terms used in the amended rule.
[5] In fact, if the common interpretation is that used in Couch on Insurance, then the term "dwelling" might unambiguously include the structure at issue here. However, because neither party makes such an argument, we do not address the issue.
[6] We note that in determining whether a claim involves a bad-faith failure to investigate, the date of denial is crucial because "information received by the insurer after the date of the denial is irrelevant to the determination of whether the insurer denied at that date in bad faith." Insurance Co. of N. Am. v. Citizensbank of Thomasville, 491 So.2d 880, 883 (Ala.1986). An insurance company's denial is either "express," otherwise known as "actual," or "constructive." Blackburn, supra, 667 So.2d at 668. In Alabama, a plaintiff can establish a constructive denial in two ways: "(1) by showing that the passage of time is so great that the delay alone creates a denial; or (2) by showing sufficient delay in payment coupled with some wrongful intent by the insurance company." Barry D. Woodham, Comment, "Constructive Denial," "Debatable Reasons," and Bad Faith Refusal to Pay an Insurance ClaimThe Evolution of a Monster, 22 Cumb. L.Rev. 349, 361 (1992) (citations omitted).
[7] We note that this holding has no effect on those cases in which an insured sues the insurer for bad-faith denial of an insurance claim but does not sue for breach of contract and the case proceeds to the jury on a claim of bad faith alone. See Livingston v. Auto Owners Ins. Co., 582 So.2d 1038 (Ala.1991); Jones v. Alabama Farm Bureau Mut. Cas. Co., 507 So.2d 396 (Ala.1986); Aetna Life Ins. Co. v. Lavoie, supra.
[8] We also note that we could not have reached this issue on original submission because the Slades specifically argued that the verdict was not inconsistent. Instead, the Slades relied on their argument that contractual liability was not a prerequisite to bad-faith liability. Although the Slades did argue that the jury implicitly found that State Farm breached the insurance contract, when it found State Farm guilty of bad faith, they did not argue that such a finding was a basis for a new trial.
[9] As for State Farm's argument that the trial court erred in allowing the Slades'"pattern and practice" witnesses to testify, State Farm has cited no legal authority to support its argument. We do not address contentions made without supporting authority. See Rule 28(a)(5), Ala. R.App. P.; Loyal Am. Life Ins. Co. v. Mattiace, supra.
[10] On rehearing, the Slades have pointed out that at trial they established that Mr. Slade has a learning disability and that he has difficulty understanding what he reads. However, the Slades did not show that State Farm or Carr was aware of this fact and therefore knew that the policy needed to be fully explained to him.
[11] This distinction found by the Court of Civil Appeals is consistent with the generally accepted definition of the term "collapse." See generally George J. Couch et al., Couch on Insurance § 148.63 (2d ed.1982).